Court may please report My name is Tony Sean from Prescott, Arizona representing Mr. Carboun. John Carboun jis a police officer for the City of Chandler. He was the President of Association. These are labor police organizations. And the facts of free speech in this case are that he wrote a letter going to serious public concern matters dealing with police officer safety to the City Manager of the City of Chandler. It was written shortly after the fiery death of his squad mate in a Ford Crown Victoria automobile and the safety of the vehicle. He wrote the letter when he did because he had just found out in a meeting with the fleet manager of the city that the city had not sent a representative to this meeting put on by the Arizona Police Association at another city in the Valley of Phoenix area. And he felt that the police administration, because of this incident and other incidents that he wrote about in his letter, did not take safety of police officers as its priority. And he was particularly concerned, and that's why he wrote the letter at that time. As a union official or as an individual police officer? He wrote the letter as an, well, I don't know. It's on the letterhead of the union. It's not an official, but it's an organization. He wrote it as the organization president for the members, yes. As the organization president. Yes. So now he's participating in this as an organizational president to the city manager talking about existing problems within the police department. These weren't new to him. These were continuing on. He was saying he's been continuing on to see what happens when you don't take care of things, someone dies. Correct. Correct. And it's not his own personal concern. That's the big difference between this and the Los Angeles case. But there's a little problem here. He can step over here as a president, put the president's hat on, and he can write all kinds of things about the grievance, but at the same time, he's a police officer, and he has a relationship within the paramilitary unit and the discipline within that unit. And I think that's where I think the city is talking about is his function as the police officer. Can he take off the hat and all of a sudden escape the fact that he's a police officer and his actions reflect on his interaction with the unit? Well, he, yes, he's a police officer. He's not a management police officer. He's not up there with the police chief. He's a police officer who's the president of a union. It's really not a union in the collective bargaining sense, but it's like a union, and they call it a labor organization in Arizona. But he's acting for the members. He's not acting for himself. It's not a personal issue. That's what makes it a core First Amendment issue. But I share the thrust. I share the view that's I think behind Judge Burnett's question is to say because he's a police officer as well as the president of this organization writing in his words, speaking as the president representative of CLIA, but because he's a police officer, we need to engage in a pickering balance. Correct. That's to say if he were not also an employee within the organization, this would simply be free speech and that would be the end of it. But we need to do pickering because he is not only the president of this organization, but also a police officer. So how do we do the balance? Correct. Okay. And that's where we disagree with the district judge. We agree that you have a pickering balance. And a pickering balance, the courts has to consider facts, make a factual decision. The Ninth Circuit here will be doing that also. We say the courts, the district court made a significant error and mistake when it found this First Amendment concern only limited First Amendment concerns. And we say it's not like the Los Angeles or the Cochran case, which I think was limited, because in that case you had a guy concerned about himself and being, what was it, exact words in the Cochran case. The speech involved complaints against his supervisor for unfair conduct and favoritism. Also in the Cochran case it involved internal office matters. It involved conduct that was direct insubordination to a superior officer. And in the Cochran case it caused disharmony among the coworkers because it had racial and gender negative overtones. So if you look at the first page of the letter, it starts out about his understandable grief and distress about the death of his friend, a police officer, in the burning in the Crown Vic. Correct. And the first page sets it all up that he's just distressed over this whole thing. And then he drags in, and he also discusses in that regard that he didn't have a fire extinguisher. And if you read through what's going on here, there were no fire extinguishers there. The record shows that there were fire extinguishers, but these little fire extinguishers were not going to put out the fire. From that point, then he goes into the litany of things that's wrong with the police department, which are internal matters. So he's bouncing off the fact that he's distressed because his fellow officer was burned. Now, it certainly came from the Crown Vic, but that's an old history. They were working on that. He knew about it. Everybody knew about it. But this letter did, according to the city, inflame folks, upset folks within the department. Now, why is that so different than the case you just cited? I mean, I'm talking about what I perceive their position is from their briefs. Well, this is a whistleblowing letter. This is a letter where he is concerned about the death of his friend, and he is concerned that they didn't go to this meeting where they were going to talk about fuel bladders as a possible fix for it. And he said in the letter that the city of Phoenix was going to be putting fuel bladders on theirs. And they want to use these Ford Crown Victoria automobiles because police departments like these vehicles. They've got a lot of power in them and stuff. But whistleblowing speech, management has to put up with some of that, I contend. You know, it's making management look bad, and that's why they're upset. But they retaliate against him because he says, oh, you're making us look bad is the way I view this. What if, let me go this way. As I read this talk about the Crown Victoria, which is, of course, his central concern, that's obviously what triggers his letter. It's what he says triggers the letter. That's what he closes the letter with. Let's get these fuel bladders so that the cars are safer and so on. But as a lead into this, he does recount some of the old history. He does say that police vehicles are not issued with fire extinguishers. It appears from the record that they really are, although some of them don't have them. And there may be a bit of an obstacle from time to time if Chavez doesn't have one or he can't respond to the e-mail right away or apparently for a while they were under lock and key because he had an inventory shrinkage problem. And there may be some dispute about how often the new vests were issued. There may be some dispute as to whether Jerry Ruland was really the, said exactly to him what he said now to investigators later. There may be some dispute about the holsters. Does it matter, as the city really does matter a lot, does it matter that he might have said things aside from his talk about the Crown Victoria that weren't true? Well, there was a hearing before the Merit Board where there was a finding of no statements were made. After a three-day evidentiary hearing, we cited a lot of that in your record, that there's no knowingly false statements. And regarding the fire extinguisher, he did say, I mean, it was he and a bunch of other officers had trouble getting them. They were not there. They had trouble getting them with the ---- Well, that's not the same as because there are no extinguishers issued to our police force. That's correct. It's not the same. But if you look at the Multoma case, the Johnston case, on that, you have to show actual injury to the department. And you have to, you know, free speech has to have some breathing room. It may not be exactly correct, but it's at least not a knowing falsehood. And he has a legitimate reason for his belief, because he can't get fire extinguishers. Jerome couldn't get, or the other officer, Rome, couldn't get fire extinguishers. But to answer your question, he's going into the history. He's talking about this because of the death of his friend. That's the emergency issue at the time. He goes into the history of where Clee has had difficulty with the administration in other issues, the protective vests, the holsters, the death of a friend. That helps you. I mean, I read this, and it seems to me more than anything else to be an effort to get the city manager and the city council to pay direct attention and create a direct relationship with Clee. I mean, he talks about embark on a safe new course of travel that openly recognizes Clee as a source of information. Correct. That makes it much more of an employee-employer situation, not a First Amendment kind of situation. I could see this letter being written by an employee to the board of directors of a corporation. It sounds purely internal. Well, if it's purely internal, that suggests for a Pickering balance. It's much more in the employee relationship than on the public concerns side of the scale. Internal, but it's dealing, Judge, with officer safety, which I contend, if you look at the Gilbrook case, we think the Gilbrook case in this Court is the most on point of all the cases in this Court. It's a fire department case, but it's very similar. And if you look at that, this goes to the core values of what the First Amendment is all about. I'm with you a little bit, but I get into a fuzzy area, as we've discussed here. The way he wrote on the letterhead and signed it as present, he finishes it off extolling the virtues of let's get together and work all these problems out. It's obvious that there are problems that if he truly represents, and will have to for the purposes of this letter, the concerns of the organization, the labor unit. And that's fine. He says, I'm going to deal with you. I'd like to deal with you. But what he does, he goes back and he uses the fire, the death, as a reason to attack the internal operations of the organization. Now, what bothers me is, is they reacted to him as a police officer, when in fact, he was speaking over here as the president of the union. Now, you said, well, but it's a whistleblower. Is he acting in the letter, in your mind, as a union president having a communication with the city manager about matters affecting union members, or is he a police officer who says, forget about the union over here. I'm just, I am just distressed. My, my, my fellow officer has been burned up. You're not doing anything. And I'm going to whistleblow on you. What is he doing in your mind? How are you arguing? He's acting as the union president for his members. He's not a whistleblower. Well, he is a whistleblower. How can he be a whistleblower if he's acting as a union president? Whistleblowers, employee, employee. This guy is a union president. You've got to take some hats off, I think, here and start figuring out which hat he's wearing at the time the letter goes out. I think. Either that or you merge them all in one ball and say, well, he's the president of the union. He's a whistleblower. He's a police officer. He's acting for the union. What is he acting here for? How can he act, I guess, how can he act as a whistleblower if that's your position? Well, he does have a little bit of both because it's his personal friend who has just died. And he talks about that. Of course he does. But this letter is the key to the whole thing. If we didn't have the letter, we wouldn't have a case, right? Yeah, that's the speech. Okay. It's the only speech we're involved in. It's written on the labor organization's heading. It's signed by the president. And he's appealing to the organizational top, if you will, of the police department, the city manager. Speak with me. Talk with us. Work these problems out. Where's the whistleblower? Well, the whistleblowing is he's complaining about the way the department has done. Of course he is. He's the president of the labor organization. But where is the police officer, the person in the ranks who's seen all this muck going on and he's distressed for the safety of his officers as a police officer? Where's the whistleblower? I mean, take the hat off. What are they supposed to do? I guess this may be my question. How is a city manager supposed to react to this when they get the letter from the president of the labor organization? How they're supposed to react is I think she did the right thing. She gave it to the police chief. I want your response. He did the wrong thing then. He attacked the person, the messenger, for writing the letter and assumed some statements were false, and then he fired him because of the letter. He didn't even get a response back to the city manager. Now, do you care whether he is characterized as a whistleblower or not a whistleblower? That is to say Pickering says nothing about whistleblowers. It says talking about matters of public concern. Correct. But a whistleblower seems to me, I don't think you need that. You're right. We don't need that. We could throw him off the table as a whistleblower because you kind of put me, again, in this fuzzy area and start talking whistleblowing. Well, he's bringing forward matters of great public concern dealing with police officer safety. That's what the First Amendment is involved with. I use the word whistleblower because I think Roth versus the Veterans Administration used the word whistleblowing speech. I think somebody else used it in one of the court cases. But it doesn't have to be whistleblowing. It's bringing a matter of great public concern to the attention of somebody who can do something about it. And that's the police officer doing this? As a police officer. Is that your question again? Well, he's doing it as the president of the association for his members. He's also doing it, I think, for himself because he's concerned, too, and he has problems, too. And in that sense, does it really matter? I mean, we clearly have a line. It's a little blurry, or maybe I'll say it's a broad line and so it covers some stuff. In our cases between you're not particularly protected under Pickering if you're just whining about things that happened to you. I didn't get my promotion. My boss was mean to me, blah, blah, blah, blah, blah. That's personal stuff. That's very limited there. The other side that's really quite well protected is the guy says, listen, this has nothing to do with me. But I've noticed in the conduct of the department of business, business department, the boss is always accepting bribes and signing contracts with his best friend. Okay. Now, that's a matter of public concern. Well, and then, of course, from those two polls, we come back toward the middle, and we talk about matters that are matters of public concern. And certainly I think anybody is going to concede, and the district court concluded, that officer safety is a matter of public concern. What I don't see here is any charge by Mr. Carbone that he's complaining about he didn't get a promotion. He got mistreated. He's complaining generally about things with respect to officer safety. Now, he says some things that appear not to be true, but I don't see that he's whining about things that are narrowly specific to him. I agree. And that's what makes it a matter of public concern. But I don't see whining about things particular to the organization that he's trying to empower. And is that enough to make it a matter of public concern? Well, he's doing that because the other police officers who are members of his organization have the same concerns. They're afraid to drive these Ford Crown Victoria automobiles. They've had concerns about the holsters and the vests. Yes, he's bringing forward concerns of the other members. It's his own concern, too. On the balance, and I've identified my concern, which is that it looks to me that this is much more having to do with the interests of empowering CLEA. Where does that interest? Is that a public interest or is that a private concern for Pickering Valance purposes? Well, CLEA is the organization, and there's testimony in the record, who can better bring these concerns of officers forward. If they do it individually, they're worried more about retaliation and not being believed. But if they're organized, then they think they're going to have a better belief. But this is these are bringing forward matters dealing with police officer safety, serious matters dealing with police officer safety. And that's why under the Gilbrook case, they go to the core values of public concern. Now, so far we've been talking about the degree or importance or how to characterize these matters of public concern. How strong are they? Are they infected by personal matters and so on? The other side of the Pickering Valance we really haven't talked about, and that is the potential for disruption of the function of the department. Why is this not so disruptive that once you do the Pickering Valance, he loses, even though these may well be matters of public concern? Well, we believe the judge, the district judge, erred just in this, because this was one of his reasons for balancing the rights against us. On the other part of the balance. Right. This was and we think he erred because he didn't consider the law from this circuit that when you have a matter that goes to the core values of public concern like this one, police officer values, then you have to take more disruption in the police department. You know, more disruption is required before you can you can retaliate against the speech. I understand what you're saying, but it seems as though he's complaining about internal matters of the police department versus something that the public might be interested. For instance, if the crown vix, I can't think of a good example, but the crown vix that may explode, the police department, the public might be concerned about that, but it's more concerned of the police officers internally who have to use the vehicles. It isn't that all the cars are exploding and they can't offer police services. The cars aren't instantaneously going crazy to the point where they have no police department. So it sounds like these are personal concerns of that are internal to him and internal to the to the individuals, but not necessarily directly imposing a public interest. But if police officers can't be safe and if their cars are going to blow up, then the public can't feel safe either because police officers aren't doing their jobs. There's nothing in the record that says that, that I know of. I mean, we know that the car blew up and we know that crown vix have a problem, but that doesn't say. And it's very concerning to the people who have to use these vehicles. But but and it could be an argument. You know, it does have some inefficiency with regard to the department. But if that's your best case, if you're worried about the fact that these automobiles are going to blow up and the public's concerned about it. Yeah, the public's concerned about it. And there are cases in this court. I've got them in my my brief that say any matters having to do with police officer safety or law enforcement matters are matters dealing with public concern. Well, you'd have to go back to those cases. These are all fact driven and fact specific. OK. Some of them come right here from San Francisco. Now, you've used your time. Let's hear from the other side and then we'll give you a chance to respond. Morning. A fascinating discussion that, of course, has my mind racing as I am sitting there listening. Your name for the record before you start. Catherine Baker. Representing. I represent the city of Chandler and Chief Bobby Joe Harris and Patrick McDermott. Just as a point of interest, the collision actually was a T-bone collision where the axle broke off and went through the gas tank. It was not a high speed rear end impact. It was the kind of impact that could have ruptured a gas tank in any car and not one that there's any proof that a fuel tank ladder would have aided the officer or allowed him to get out or stop the fire. I also find it interesting. This discussion is fascinating. And just to go where you've been talking about is what was the actual purpose of the letter. Some of your comments suggest that you think that it really was aimed at the Crown Victoria. In fact, I think it wasn't aimed at the Crown Victoria at all. I think that the accident was, of course, emotional to Officer Carbone and to everyone in the department. But I think this was a personal dispute that Officer Carbone thought, aha, you know what, everyone's going to be upset about the death of an officer. I want them to look at me, me personally, for information in this department. And so I want to bring Chief Harris down. And so what he did is he sent this letter. And we have always treated him as an employee, not as the president of CLIA, even though in some ways this sounds inconsistent with your leanings in a way that might favor us. Well, I don't know. Let's stop there because I want to make sure I understand what you just said. The letter speaks for itself. It's on the letterhead of you call it a union, labor organization. It was an employee organization until there was collective bargaining, and now it is a union. Okay. It was the organization, and it was signed by its president. And in the end, it's pretty clear that it's almost begging like we ought to get together and talk these things. I mean, I'm just paraphrasing. But it was promoting these are the problems. Listen, I want to talk to you. I'm communicating with you. But he's trying to at least that part of the letter seems to be trying to promote the organization and dealing with the city manager. It does. And in a way, one could say it might be considered typical union organizing rhetoric. The problem is that the union had a board to authorize correspondence such as this and didn't do that. And then we have testimony in the record from other members of the board of CLIA who said, you know what, we never saw this beforehand. We would not have approved the tone, the content, the manner of the speech, which, of course, is what the city reacted to. And we have the mayor board finding that it was not a CLIA letter. It was a personal letter by John Carbone. But it doesn't matter that it was a personal letter in the sense of signed by him if he is raising matters of public concern. Absolutely. So. Which we say he sent it. Well, wait a minute. You're saying these were not matters of public concern because we don't care about public safety, officer safety? Because they weren't issues of officer safety. The holsters, for example, was a personal preference issue. Let's say with the Crown Victoria, you say the fuel bladders are not matters of officer safety? No. Blowing up a police car would be a matter of officer safety. The problem was, in that sense, he's not telling the city anything that it didn't already know. And there's nothing that can be done about the Crown Victoria. In fact, before they got the letter, they had already authorized fuel tank bladders. But the problem is it was. Wait a minute. I know you said that in your brief. So before they even had the letter, they had moved to solve the problem with fuel tank bladders? Absolutely. Tell me more about that. Okay. On the 13th, which is the day after the accident, Mayor Boyd Dunn spoke to the mayor of the city of Phoenix, and they both agreed that the two municipalities would move forward together or at the same time and approve fuel tank bladders for their cars. Actually, that may have been on the 12th. On the 13th, there was a city council meeting, a swearing in of new members, and they agreed to appropriate funds for fuel tank bladders at that time. On the 18th, however, which is what you have in the record. I'm not sure the Boyd Dunn information was cited in the record. On the 18th, the city manager, Donna Dreska, met with Manny Chavez and other city officials. You have reference to an e-mail in the record, and they approved fuel tank bladders at that time. The 18th of what month? Of June. They didn't receive the letter until the 19th. Well, it's dated the 15th of June. Right. And so the approval by the mayor was actually before the letter was even written. How does this help you? It seems to me that they're taking this action so quickly in response to the accident shows that he's absolutely right that this is a matter of public concern. And when he writes the letter, I'm looking at the deposition testimony of the city manager. He's talking about, and did you have a meeting on that day, that is to say the 18th, three days after he writes the letter, one day before they receive it, where a decision was made to approve fuel tank bladders for the fleet of four Crown Victorias the police department had? And the answer, there's a little bit of garble here, but the answer is yes. Right. So it turns out that the city agrees with him that it's a matter of intense public concern, and they make the decision three days after he writes the letter. Well, the city never agreed with him on anything, really, and never agreed with him that it was a matter of intense public concern. It was an internal. Wait, wait, wait, wait, wait. You cannot say that the city doesn't think this is a matter of intense public concern given they're very quick and it seems to me commendable actions immediately after the accident. The city manager itself is saying in his deposition testimony, of course it's a matter of intense public concern. That's why we acted so fast. I don't think she said it was a matter of intense public concern. She said it was an important matter that they took care of immediately. And how does that change it from an internal matter? Listen to me. Okay. Question. Weren't you aware of the shaving down of the bolts, whatever being done? No. But after the Nielsen accident, did you make it one of your missions to see exactly what was being done? Exactly. It became a priority. Because an officer died. Well, of course. Okay. And as the court has just been discussing, you have internal matters regarding interests of officers themselves, and then you have matters of public interest. Officer Carbone wrote his letter because he wanted to use fire extinguishers, which had nothing to do with the Nielsen accident, to inflame the department not to help the department with regard to the Crown Victoria. Nobody disagreed that the Crown Victoria problem had to be solved. What I'm saying is Officer Carbone added nothing to that, nor do we. Is it true what Officer Carbone says in his letter? I'm now on the third page of the letter. No, I'm sorry. I'm on the second page of the letter, the second to the last paragraph. Police administration failed to return Arizona Police Association calls with respect to the problem that the gas tank did not send a representation to an informational meeting that I believe would have provided the department with additional information pertaining to this issue. Is that true? Yeah, absolutely. So in other words, up until the time of this accident, he has a legitimate ground to say, you know what, you're not paying enough attention to this. Not true at all whatsoever. The testimony ñ Wait a minute. Let me make sure what's true and not true. The sentence that I just read to you is true? It's true that they didn't go to the meeting. Okay. So he's trying to make a record that there was ñ you talk, then I talk. So he has some basis for saying you were not paying, in our view, enough attention to this important issue. No, he doesn't. Because the testimony ñ Even though that sentence is true. It's true they didn't go to the meeting. Because the testimony is also that Officer Carbone has no idea what was discussed at the meeting. The testimony is also that Officer Chavez had already been going to fairs, et cetera, about what other vehicles could be used, already knew about the fuel tank bladder, already knew about the fuel shield, which could be put in and would disperse a flame retardant. The problem was, and for example, in Arizona there was the governor's blue ribbon panel to decide what to do for DPS state officers. Nobody knew what the correct fix was. So for him to say, gee, you didn't go to the APA meeting, that means you're doing absolutely nothing at all whatsoever, you don't care, is not accurate. And had he made reasonable inquiry ñ Now, did he say you are doing absolutely nothing? I believe he did, yes. Where did he say that? That's what the intent of the letter is. I didn't say what the intent of the letter is. I asked you, did he say that? No, he doesn't use those exact words. Okay. But again, he doesn't use the exact words, you killed Officer Nielsen. And yet that's what he's saying. He doesn't use the exact word, you killed Officer Nielsen because you didn't care enough to give me a fire extinguisher. And yet that is what the intent of the letter was. That's what it said. Well, I agree with Judge Bonet. The letter speaks for itself. I read the letter as saying you have not paid enough attention to officer's safety in the past. This is the most recent and most dramatic and most serious example of it. But I see nothing in here that says you killed the officer. And city manager Dreska read it. She's the recipient of the letter. She said that's exactly what she took it to mean because he said all I could do is stand there. But for the want of a fire extinguisher, because the city doesn't issue fire extinguishers to patrol cars, there was nothing I could do. That's what he said to her. Now, I think it's disingenuous for him to say, well, the way I wrote it led you to believe that I was saying that you killed the officer, but I didn't exactly say that. That's what he was saying. That's why it was so disruptive. He said the same thing in the briefing room. That's why the impact of this letter is so disruptive. You take a department when their morale is the lowest, when a Crown Victoria has caused an accident which no municipality in the nation had been able to solve. It is not a problem we created. We didn't disavow it. We were not inattentive to it. And he basically says you killed this officer, and he uses facts that are knowingly false to create that impression. And that is the impression created in Donna Dreska. That's relevant. The one person to whom he sent the letter, by the way, he wasn't speaking out to the public in a way to inform the public so that the public could make a rational decision about what was going on. He sent it merely to Donna Dreska, who was the chief of police's direct supervisor. Are you arguing that he would have a stronger case if he'd sent this letter to the newspaper? Yes. Yes, because in the Pickering balance, it weighs in favor of the employer that it had a limited audience, that he sent it merely internally to a single recipient. He sent it merely internally to the city manager who was the supervisor of the chief of police with whom he had had a longstanding dispute. That also weighs in our favor in the Pickering balance. I think the district court was absolutely right that in this case the speech, if any, gets only limited protection. And then as we go through the Pickering balance and we look at all of these factors, the fact that he's raising stale issues. My goodness, AAA vests, which again was not a safety issue, it was a personal preference issue, because they wanted lightweight vests which actually do not protect the officer as well as a heavy vest because they allow greater intrusion into the body cavity. It was personal preference. Holsters, personal preference. They didn't want the Bianchi, he wanted the Safariland SLS. The Bianchi was never proven to be unsafe. It was never stopped issuance by the city of Chandler. He's raising stale issues that have already been resolved. He's raising issues to which the city has been fully responsible. I read a fair amount of the record about these holsters, and I gather that there was some ground, some reason to believe from the record that there was some safety concern about the holsters because I gather that there was some possibility that suspects could take the guns out of the holsters because the snaps weren't particularly well attached, they weren't designed in such a way. I don't think you can say there was no safety issue about holsters. Let's say that he's a little bit inaccurate in what he says, but I don't think you can say there was no safety issue. Well, here's why I say this, Your Honor, because the evidence is that any mechanical piece of equipment can fail. So in other words, if I say that once or twice or even what they found ultimately is I think they found 15 to 17 instances through the 250 to 350 holsters that had been issued where snaps may have stuck, and what you do is you take the holster of the quartermaster and you get another. You can't find a piece of equipment that has a better performance than that. So to say it's an officer safety issue is inaccurate. It was a preference issue. But even so, what the city of Chandler had done was for almost a full year before that, they had been analyzing the holsters. Before the letter, they put the holster he wanted on the voucher program, and then when the cost changed, they issued it to him. It's not at all like the cases he cites. For example, the case of the firefighter that he cites where he says that he – where the firefighter complains about the city being inattentive to staffing issues and therefore there was a death. Here you have the city of Chandler remarkably in this case responding every time an issue arises and incredibly for every issue that had been brought to their attention to the best of their ability already resolved before this letter. Yes. Because you said that, and then when you talked about the Crown, you said something that confuses me. Okay. You said that the city had done all that anybody could do about fixing them prior to this accident. Right. Yet after the accident with days, they got the bladders. Yes. I don't understand that. There was no municipality in the United States that we can find anywhere that authorized and installed fuel tank bladders before the city of Chandler. Everybody was victimized by the Crown Victoria. And so what I'm saying about that is it's absolutely inaccurate to say either the Chandler did nothing or did not do enough. That's fine. The thing is if the city of Chandler was willing to put the bladder in after the accident when nobody else was doing it, why didn't they put it in before the accident if they were proceeding diligently? I don't quite understand the logic here other than what Judge Fletcher brought out clearly about what happened at the meeting. I'm going only to your statement. Right. And this is just human nature. It's the plain facts. They had a death that hit them close at home. And then they said, okay, we've done everything we can. We don't even know if it would have prevented this accident. We don't know if it's going to prevent any other similar accidents. In fact, at the time they did it, they didn't even know if it would stop fuel tank fires. They said we're just going to do it. Why? Is that clearly the record that they did it for those reasons and they weren't positive that this was a de-fix? Yes. And nobody at the time was positive that it was a fix. If anybody had been, it would have been put in already. Nobody knew whether it was a fix. There was still a debate. There were tests and debates about whether, what does the fuel tank ladder do? Will it stop a fire? Does it slow the leak? But is it true that the city of Chandler was aware that the tanks were dangerous in the form in which they came out of the factory? In the form in which the cars came out of the factory. They knew that there was a problem. Yes, everybody knew there was a problem now. In the way they came out of the factory, what we had already done is we had ground down the bolts. So I guess you could say that if you didn't ground down the bolts when that was recommended. Now, did we know at the time that we got the cars? No, I think we knew at the time that they recommended grinding down the bolts, that that was something that could be done, and therefore we did it immediately. So there's no dispute. We've never disputed that there was a problem at the Crown Victoria. What we dispute is that it's an example or that he could ever reasonably represented it as an example of the administration's less than enthusiastic pursuit of officer safety issues. Yes, I'm not really interested in charging that the city of Chandler has been inattentive to officer safety. From the record in front of me, I can't conclude that. That is to say, they did appear to have conscientiously followed the manufacturer's recommendation to take off these little brass tabs. As soon as they have this horrible accident and death, they move to put in very quickly the fuel bladders, thinking that it's going to improve matters even though, you know, nothing's perfectly safe. And I gather later they put in shields and so on. I mean, that's not really the issue in the case. The issue in the case is whether this letter was a legitimate raising of matters of public concern. And it seems to me that it was a raising of matters of public concern, which then just gets us into the Pickering test, so then we have to balance. How disruptive was this letter, which was not sent to anybody except for the city manager? We say it was disruptive in several ways. Of course, as you know, the competing organization, the Fraternal Order of Police, put it on its Web site. It became very well known. It contained the same types of- Wait a minute. But that, given your previous answer to me, may be a double-edged sword for you. You're saying that if it had been put out more publicly, he'd have a stronger case. The question is- I'm not sure that's true, but that's what you said. But I understood your question would be the intent of the person who was speaking. I'm not asking about intent. I'm now asking about how disruptive it was. I understand that, Your Honor. But then you went to, gee, isn't that a double-edged sword when I answered the question about what Carbone did. Carbone sent it to one person. That's Carbone's intent. His intent is not to speak out on a matter of public concern. It becomes known. That creates disruption. That does not tell us whether he intended to speak out on a matter of public concern or whether he intended it to be a wide audience. It just tells us that it became a wider audience that created disruption. It contained the same type of misstatements and lies that he made in the briefing room. In the briefing room, he accused the chief specifically of lying. In the letter, he says the administration told everyone that Nielsen died on impact, implying that we're lying about what happened when, in fact, the testimony is even he didn't hear the chief say that. Nobody heard the chief say that. So there was disruption in that regard. There's impairment of his ability to do his job, and this goes into the Pickering balancing test, because it impairs the trust and confidence between him and his supervisors, and there are cases that say that that's significant. Let me skip to my notes here. He impairs discipline by telling in the letter basically saying the administration cannot be trusted. Not only have they been false and misleading, and this wasn't true when he said it, about the Nielsen death and the cause of the death and died on impact, he talks about Snedeker, somebody he knows nothing about, a stale issue, a 1999 SWAT operation, and he suggests a cover-up there. How do you know he knows nothing about the Snedeker incident? Because he testified to that in his deposition. He wasn't there. He wasn't even at the scene. He knows nothing about it. Yeah, yeah. But not having been there doesn't mean he knows nothing about it. He testified he knew nothing about it. He relied solely on something that somebody told him, and in his deposition said, I can't recall specifically if this is the person who said that. Then he said that it was a person named Spielman who supposedly said something about they weren't supposed to discuss it. Spielman was talked to in the investigation. He said, I never said that. John Carbone never had any information about the Snedeker shooting, and yet he raised it again. Another stale issue. That impairs morale. It impairs discipline. It impairs his relationship of trust and confidence with his supervisors. You know, he was terminated in part for his history of being untruthful and misleading, and he made false statements in this letter, and he was reasonably perceived as an officer who couldn't be trusted to tell the truth. And, in fact, in this letter, many false and misleading statements that are inflammatory, and he meant them to be inflammatory, because really what he wanted was to further his argument with the chief of police and to get them to look to him, John Carbone, as the oracle of what is safe. And to give them, he was angry that he didn't get the lightweight vest immediately, although he ultimately got them. He was angry that he didn't get the holster immediately, although he ultimately got it. These aren't important issues. These are internal issues where he's saying, you know what, listen to me more and give me what I want faster, honestly, is what it was all about.  It was the inflammatory hook to throw out there to get people upset so that maybe they would do what he wanted faster and more quickly. And that's why it's important that CLIA even found the letter to be inflammatory. It removed him as president. That's the testimony from Dave LaVoie. That, again, goes into the Pickering balance. And I know I am almost out of time. You are over time. Oh, I'm sorry. Once it gets to red light, the numbers are counting up. Oh, I'm sorry. No, sum up and then you're finished. All right. Well, I know that you're well familiar with the record, obviously, and it's been an interesting discussion. I hope it's been helpful in some way. In addition to the Pickering balance, of course, we believe that there is qualified immunity and there's no basis for municipal liability. And we would ask that you find it in our favor on all of those. Okay. Thank you. Thank you very much. Thank you. Response? How much time do we have? Let's start with two and see what happens. Everything she said, there's questions of fact on. I think regarding disruption in the workplace, management is the one that feels there is disruption because they feel attacked. You know, you're blaming us for less than enthusiastic pursuit of safety concerns. So, of course, they're going to feel that that way. But other co-officers are not. There's no evidence that there's any disruption with the co-workers. Like the Gilbrook case says, regarding this Brewster factor of whether you've got public knowledge by just giving your letter to the city manager, that's different than just giving it to a co-worker. And he doesn't complain about co-workers. So there's not going to be any disruption regarding the co-workers. And the Gilbrook case talks about that. If you're going to be complaining about people causing disruption, it should be against the co-workers. Just a few facts that she mentioned regarding the bladders and what the city did. The city mayor, right after the accident, talked to the Phoenix mayor. The Phoenix law enforcement association had been advocating bladders, and they were part of the Arizona Police Association. Carbone was the secretary of that. He knew prior to the accident that bladders were the thing to do. So after the accident with Nielsen, then the city of Chandler mayor talked to the city of Phoenix mayor, and they decided to do bladders, which is a good thing, which we don't complain about, of course. Carbone, when he sent the letter and wrote the letter, he didn't know that. But he did know, because he had been with the APA, that this was a potential fix. So that can't be held against him, the fact that the city was doing that. And I also heard you say, are you saying to her, are you saying he'd have a better case if he made his complaint to the newspaper? And I did cite one case from the Tenth Circuit, I realize it's not yours, but said doing that and not dealing with it internally with the person who can do something would be a negative toward him, because it may cause more disruption to be going to the newspaper rather than trying to get it done with the person at the top who can get it done. And I point out that the police chief said that going to the person at the top, the city manager in the first instance, was not improper. So there's no chain of command even argument here, as there are sometimes in police departments. Regarding the history, the protective vests, there was a lot of testimony that they put the vests on the bottom priority. They put the holsters on the bottom priority. There is testimony that there was problems with the holsters in the investigation of Carbone. There was some mistakes done by the investigator, didn't even find all the problems. And last but not least, everything that Ms. Baker just said about false this and false that, the evidence that you've got before you in the record shows there's a question of fact on all of those issues. Okay. Thank you very much. Thank both sides for their argument. The case of Carbone v. Cecilia Chandler et al. is now submitted for decision.
judges: Brunetti, W. Fletcher, Clifton